# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

SYLVIA L. PFLUCKER,

      Petitioner,

v.                                   Case No: 8:21-cv-1869-WFJ-JSS

KIRBY R. WARMS,

      Respondent.

_____/

## ORDER DENYING PETITION

This matter comes before the Court on Petitioner Dr. Sylvia L. Pflucker's Amended Verified Hague Convention Petition. Dkt. 7. Petitioner asserts that the parties' two minor children, M.R.W. and N.W., have been wrongfully retained in the United States and must be returned to Peru pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* Respondent Lt. Col. Kirby R. Warms filed an Answer and Affirmative Defenses. Dkt. 25. The Court held a three-day evidentiary hearing and benefitted from the testimony of Petitioner, Respondent, and several witnesses, as well as able briefing by both sides.

Upon consideration of all filings and testimony, this Court denies

Petitioner's petition. The Court finds that Petitioner did not bear her burden of

establishing wrongful retention and, conversely, Respondent did establish the

defenses of consent and acquiescence. To the extent that the parties differed as to

the factual history, the Court found Respondent's testimony to be more credible,

more internally consistent, and more based in the evidentiary record.

## BACKGROUND

Petitioner and Respondent were married in September 2011 in Louisville,

Kentucky. Dkt. 58-1 at 2. The parties share two minor children, eight-year-old

M.R.W. and five-year-old N.W. Dkt. 58-2 at 3, 7. Both children were born in

Lima, Peru. Dkt. 58-2 at 3, 7. The children are dual citizens of the United States

and Peru. Dkt. 58-2 at 5−6, 9−10. It is undisputed that, prior to November 2020,

the family lived together in Lima. Petitioner, a dentist, is the owner and general

manager of Smiles Peru, a dental clinic in Lima that specializes in, *inter alia*,

dental tourism. Dkt. 58-3. Petitioner performs dentistry and is also skilled in dental

radiography/radiology monitoring. *See* Dkt. 58-3 at 5. At the hearing, she

explained that she is responsible for viewing patient x-rays and diagnosing dental

issues based on those images. Respondent testified that while living in Lima, he

also worked at Smiles Peru. He stated that he worked in a managerial role,

handling clients, accounts, and other back-office responsibilities. Petitioner

discounted this, testifying that the Smiles Peru website only featured Respondent

2

as an employee to "give a higher profile to the company." Petitioner later stated, however, that Respondent handled the financial side of Smiles Peru. The parties both testified that Respondent also remained a member of the United States Marine Corps Reserve during this time and was assigned for a while at the United States Embassy. Additionally, the parties agreed that Petitioner ran as a congressional candidate in the 2021 Peruvian general election.

Respondent testified that he and Petitioner had long discussed moving to the United States as a family. He explained that the COVID-19 pandemic's effects on their lives in Peru prompted the family to decide in October 2020 to immediately move to the United States. Respondent testified that, in November 2020, he began inquiring about active-duty United States Marine Corps positions based in the United States. That same month, Respondent and M.R.W. traveled with one-way airline tickets to Kentucky, where Respondent's parents reside. Respondent stated that he then returned to Peru in December 2020 to accompany Petitioner and N.W. on their one-way flight to Kentucky. Both parties agreed that the family normally spent Christmas holidays in the States.

While the parties and both children were in Kentucky by January 2021, the parties offered conflicting testimony as to the nature of the family's presence in the United States at that time. Petitioner testified that the family's trip to the United States was never intended to be permanent. Rather, she stated that she had intended

3

to return to Lima, Peru, with the children on January 27, 2021, as evidenced by flight reservations made six days earlier. *See* Dkt. 58-6. Petitioner testified that, on that date and thereafter, Respondent prevented her from returning to Peru with the children by continuously withholding the children's passports. She also stated that the children's Peruvian travel documents showed that the children were only permitted to travel to the United States for one month.

Respondent testified that the parties traveled to the United States with the intent to permanently relocate here. Respondent stated that, in January 2021, he applied for a seven-month, temporary active-duty position based in Tampa, Florida. Respondent explained that the parties originally had hopes of permanently residing in Kentucky and that they began looking at homes for sale in Louisville. Respondent's mother also testified that, on Sunday, January 3, 2021, Petitioner suggested that she join her in touring some Louisville apartments. Respondent's mother stated that she and Petitioner drove to three apartment complexes but were unable to tour any units because the apartment offices were closed. Petitioner acknowledged that she visited the apartments with her mother-in-law, but Petitioner testified that she only did so because her in-laws had kicked her out of their home.

Respondent explained that, while the parties purchased airline tickets for the family to fly to Peru on January 27, 2021, the parties later jointly agreed that only

4

Petitioner would travel to Peru on that date. He stated that the purpose of Petitioner's January 27, 2021, trip to Peru was to handle the packing of their Lima apartment for their move to the United States. Respondent further testified that he did not travel to Peru with Petitioner because he was expecting orders to report to an active-duty position in the upcoming weeks and did not want to risk getting stuck in Peru due to the pandemic. He stated that he and Petitioner also agreed that, based on Peru's activity restrictions introduced in response to the pandemic, it was best for the children not to accompany Petitioner on that trip.

Both parties agreed that they toured a Kentucky private school on January 26, 2021, for their older child, M.R.W. Petitioner testified that she toured the school in error, believing that her mother-in-law was making arrangements for speech-therapy lessons for N.W. The school's director of admissions testified that the school received M.R.W.'s admissions application on January 29, 2021, and that M.R.W. was admitted to the school with an August 2021 start date for the 2021−2022 schoolyear. *See* Dkt. 57-1. But upon receiving orders from the Marine Corps on February 11, 2021, to report to Tampa for his active-duty position, Dkt. 58-5, and having no luck in the "hot" Louisville housing market, Respondent testified that the family began focusing their permanent relocation efforts on Tampa. Respondent already owned a home in Tampa, which he purchased prior to the parties' marriage.

Petitioner stated that she traveled alone to Peru on January 27, 2021, to handle her congressional campaign, work obligations at Smiles Peru, and packing the Lima apartment. The parties' testimony regarding Petitioner's congressional campaign differs. While Petitioner stated that she had a "very good rating" in the polls, Respondent testified that her chance of being elected was always a "long shot." Both parties agree that Petitioner stood in 15th place on the list of her political party's candidates from Lima alone, meaning Petitioner would essentially only be elected if the other 14 Lima candidates ranked ahead of her in her political party were first elected. Respondent also testified that, around February 2021, Petitioner stated that she would resign in the event she was elected. Both parties agree that Petitioner was not in Peru on the day of the country's general election in April 2021.

Petitioner remained in Peru from January 27, 2021 until March 12, 2021, while Respondent reported to his active-duty position in Tampa in February 2021. Throughout this time, the children remained in Kentucky with their paternal grandparents. Respondent testified that he flew to Kentucky on most weekends to visit the children. Petitioner stated that, while in Peru, she experienced health problems and underwent gallbladder surgery on March 6, 2021.

In March 2021, the parties' lease expired for their primary apartment in Lima, Peru, which had been extended on a month-to-month basis. Both parties

agreed that, during that month, the majority of family's belongings within their Lima apartment were packed for shipment to Respondent's Tampa home. These items were packed while Petitioner was present in Peru. They included clothing, furniture (such as sofas and beds), a ping-pong table, a piano, and Persian rugs. Dkt. 58-31. The United States military paid for these shipping expenses. Petitioner testified that these items were only shipped for the family's temporary stay in the United States and would be shipped back to Lima once Respondent's active-duty position ended on September 30, 2021. However, Respondent testified that he anticipated receiving additional orders requiring him to stay in the United States and that the parties had no plans to move back to Lima.

Respondent called Petitioner's sister to testify at the hearing. Petitioner's sister testified that she visited Petitioner and Respondent in Peru at least once a year between 2011 and 2017, and that each time she visited, Petitioner expressed that she wanted to move to the United States. Petitioner's sister stated that Petitioner frequently discussed her plans to work remotely in the United States, as her work in dental radiology at Smiles Peru did not require seeing patients in-person. Petitioner's sister acknowledged that she and Petitioner now have a strained relationship, but that Petitioner called her in March 2021 after the two had not spoken in over a year. Petitioner's sister testified that, during that phone call, Petitioner told her that she and the children would be remaining in the United

States permanently. Petitioner's sister stated that Petitioner told her the family was moving to Tampa and that the children would go to school there.

Petitioner stated that, upon returning to the United States on March 12, 2021, she traveled to Washington, D.C., for a doctor's appointment. Petitioner testified that she then went to Kentucky and met with her mother, who had flown to Kentucky from Argentina on March 20, 2021. Petitioner explained that she and her mother went to Kentucky to get the children from Respondent's parents. According to Petitioner, they stayed with Respondent's parents for a few weeks before Petitioner's mother was kicked out of the home. Petitioner and her mother then traveled to Los Angeles, as Petitioner stated that she had a medical appointment there. They returned to Kentucky on April 18, 2021.

On April 25, 2021, Petitioner brought the children from Kentucky to Tampa. Both parties testified that Petitioner did not want to stay in Respondent's Tampa home, as it was being remodeled and their furniture from Lima had not yet arrived. Therefore, Petitioner signed a month-to-month lease for an apartment in Tampa, and the family stayed there while they waited for their Lima furniture to be delivered. On April 29, 2021, Petitioner left an audio message for her mother-in-law on the WhatsApp messaging platform. In the message, which was played at the hearing, Petitioner stated that she was "not happy with this, all this moving to the States." Petitioner also mentioned that she had involved her own mother "to have

8

another life in another country." When asked about this message, Petitioner stated that she had been referring to Respondent's move to the United States and that she had stated "all *his* moving," not "all *this* moving." This was not an accurate reflection of Petitioner's statements in her audio message, which was played twice at the hearing.

Once in Tampa, Petitioner enrolled M.R.W. in a local elementary school on May 12, 2021, with two weeks left in the school year. Dkt. 58-21. The parties enrolled N.W. in the military base preschool. During this time, M.R.W. also finished his 2020−2021 schoolyear classes with the American school in Lima, Peru, where classes were conducted remotely due to the coronavirus pandemic. *See* Dkt. 58-31. In mid-May 2021, both parties signed paperwork to disenroll the children from the American school in Lima for the upcoming schoolyear. Respondent stated that this disenrollment process meant that the children would not be returning as students for the 2021−2022 schoolyear. Petitioner testified that while she signed the disenrollment form, she did not read it or know the form's purpose.

Petitioner testified that she only wanted to enroll M.R.W. in a Tampa school so that he could make friends while temporarily in the United States. Respondent, however, stated that the parties enrolled M.R.W. at the school during the last two weeks of the schoolyear with the intent that he would continue as a student there

for the 2021−2022 schoolyear. Petitioner admitted that she herself returned to the Tampa elementary school on June 4, 2021, to also register their younger son, N.W., for the 2021−2022 schoolyear. Dkt. 58-22. A few days later, Petitioner registered both children as new patients with a Tampa pediatrician. Dkt. 58-29; Dkt. 58-30. Petitioner testified that she only registered the children as new patients of this local physician "for purposes of school."

The testimony established that the parties agreed to purchase a BMW in Florida for Petitioner around May 2021. Respondent had earlier purchased a used minivan upon the family's arrival in the United States. Dkt. 58-28. Both parties had already sold the vehicles they owned in Peru. Respondent testified that, though the BMW was purchased by Petitioner, it was registered in his name because Petitioner did not yet have a driver's license. Respondent produced documentation from the Department of Motor Vehicles showing Petitioner subsequently tried to obtain a Florida driver's license on June 3, 2021. Dkt. 57-11 at 2. The parties testified that Petitioner was unable to obtain a Florida driver's license because she did not provide an I-94 form with updated arrival and departure dates showing how long she would be in the United States. Petitioner stated that the parties only purchased the car with the intention to resell it at a higher value upon returning to Peru. Petitioner also testified that she wanted a Florida driver's license to be able to put the car's title in her name so she could later sell it in Peru. However,

Respondent testified more credibly that this was never the plan and that the taxes and fees associated with customs would make such a plan fruitless.

On June 11, 2021, Petitioner purchased a 65-inch television for her Tampa apartment. Dkt. 57-9. Four days later, Petitioner also enrolled in classes at a local technical college to improve her English-speaking proficiency. These daily, in-person classes were to begin in August 2021 and last a full semester. The program advisor from the technical college testified that Petitioner scored highly on both the English reading and listening proficiency tests.

That same month, communications between the parties on WhatsApp show that Petitioner gathered and prepared documents needed to apply for permanent residency in the United States with the help of a Tampa immigration attorney. Dkt. 58-33 at 1−4, 6. Respondent testified that he completed two forms at Petitioner's request: a questionnaire for an I-485 petition for permanent residency and a questionnaire for an I-130 alien relative petition. Dkt. 57-7; Dkt. 57-8. The parties' WhatsApp messages throughout the month of June reveal that Petitioner continued to gather these necessary documents for a second local immigration attorney. Petitioner testified that she wanted these documents not to apply for permanent residency, but because she was concerned that she and Respondent might get divorced. Respondent emailed many of these documents directly to one of the immigration attorneys. Dkt. 57-5; Dkt. 57-6.

11

While Petitioner testified that she had been asking Respondent for the children's passports since January 2021, no documentary proof of this exists. Respondent testified that Petitioner first requested the children's passports on June 8, 2021, as shown in their WhatsApp messages. *See* Dkt. 58-33 at 1. The children's passports had been kept at the paternal grandparents' home in Kentucky since the family's arrival in the United States. On June 12, 2021, Respondent told Petitioner that his parents would bring the passports with them on their planned trip to Tampa in early July. Dkt. 58-33 at 5. Petitioner testified that, on June 18, 2021, she drove with the children and her mother from Tampa to Kentucky to retrieve the children's passports from the paternal grandparents' home. Petitioner arrived at her in-laws' home in the middle of the night and demanded the passports, calling 911 when she was refused. The next morning, Respondent's father mailed the passports to Respondent's Tampa home. *See* Dkt. 58-26. Upon learning that Petitioner had traveled with the children to his parents' home in the middle of the night, Respondent immediately flew to Kentucky. The parties testified that Petitioner refused to leave Kentucky without the children's passports, so the family spent Father's Day together before Respondent flew back to Tampa for the workweek. A few days later, Respondent flew back to Kentucky with the passports that his father mailed to Tampa. *See* Dkt. 58-23 at 2. Upon returning to Kentucky, Respondent gave Petitioner the children's passports.

On June 25, 2021, the parties, both children, and Petitioner's mother began their multiday road-trip back to Tampa. Respondent testified that, while passing through Atlanta, Petitioner began insulting him, grabbed his cellphone, and threw the cellphone out the car window while Respondent drove on I-75.[1] Financial records produced at the hearing show Respondent purchased a new cellphone in South Georgia near I-75 the next day. On June 27, 2021, while stopped at a gas station in Ocala, Florida, an altercation between the parties ensued. Respondent testified that Petitioner began hitting and scratching him. Petitioner did not discount this. Respondent stated that he decided to remove himself from the situation, but Petitioner grabbed his clothing in an effort to restrain him as he tried to retrieve his belongings from the car. He testified that he wanted to leave with M.R.W. but Petitioner and her mother would not allow M.R.W. to get out of the car. Ultimately, a police officer arrived and arrested Petitioner for misdemeanor domestic battery. Dkt. 58-32 at 55−58.

Petitioner testified that she spent two days in jail. While in jail, Petitioner wrote a letter to the Marion County judge assigned to her case, asking to be allowed to return to her "home" in Tampa. Dkt. 58-32 at 42. Respondent filed for

---

[1] Petitioner's mother testified as to these events but was not credible. She misled the Court about the phone-throwing incident. Although she testified that she was awake in the car while traveling on I-75 through Atlanta, she denied knowledge of this incident under oath. This is not credible. Petitioner admits this incident in her pleadings.

divorce on July 9, 2021, and simultaneously moved the Marion County court to order Petitioner to relinquish her passport and the children's passports. Dkt. 62-1 at 5−11. The Marion County court ordered Petitioner to surrender her passport and the children's passports to Respondent's attorney, remain in the state of Florida, and have no contact with M.R.W. Dkt. 62-1 at 73−74, 80−81. While the domestic battery case still remains pending, the Marion County court lifted the no-contact order regarding M.R.W. on September 15, 2021. Dkt. 58-32 at 2.

## LEGAL STANDARD

Adopted in 1980, the Hague Convention seeks to resolve the issue of international child abduction during domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). Signed by both the United States and Peru, the Hague Convention aims to ensure that custody decisions are made in a child's country of "habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). Accordingly, a court faced with a Hague Petition may only evaluate the merits of a petitioner's wrongful removal or retention claim, not any underlying custody disputes. *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016). In 1988, to guarantee the implementation of the Hague Convention's provisions in the United States, Congress passed the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*

This case involves a claim of wrongful retention only, not wrongful removal.

14

Not every instance in which one parent refuses to return a child is a "wrongful retention" under the Hague Convention. To establish a prima facie case of wrongful retention, a petitioner must carry a two-step burden subject to a preponderance of the evidence standard. First, to establish that a "retention" has occurred, the petitioner must demonstrate that the child has been kept outside his or her country of "habitual residence." *Pielage v. McConnell*, 516 F.3d 1282, 1288–89 (11th Cir. 2008). Second, for that retention to be "wrongful," it must violate the "rights of custody" afforded the petitioner under the laws of the child's pre-retention country of habitual residence, Hague Convention art. 3(a), which rights the petitioner was "actually exercis[ing]" at the time of the retention or "would have been so exercis[ing] but for the removal or retention." *Id.* art. 3(b). Once a petitioner meets the burden of establishing these wrongful retention elements by a preponderance of the evidence, the court typically "shall order the return of the child forthwith." *Id.* art. 12; *see also* 22 U.S.C. § 9001(a)(4); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 14 (2014); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008).

There are, however, several exceptions to the rule that a wrongfully removed or retained child must be returned to his or her place of habitual residence. A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that: the person having care of the child "had

15

consented to or subsequently acquiesced in the removal or retention," Hague

Convention art. 13(a); "the child objects to being returned and has attained an age

and degree of maturity at which it is appropriate to take account of its views," *id.*

art. 13; or the proceedings seeking the child's return were commenced more than

one year after the date of the wrongful removal or retention and "it is determined

that the child is now settled in its new environment," *id.* art. 12. Neither must the

court return a child where the respondent shows by clear and convincing evidence

that "there is a grave risk that his or her return would expose the child to physical

or psychological harm or otherwise place the child in an intolerable situation," *id.*

art. 13(b), or that returning the child "would not be permitted by fundamental

principles of the requested State relating to the protection of human rights and

fundamental freedoms," *id.* art. 20.

The Eleventh Circuit has emphasized that "narrow interpretations of these

exceptions are necessary to prevent them from swallowing the rule and rendering

the Convention a dead letter." *Gomez*, 812 F.3d at 1011. Even when the respondent

establishes one or more exceptions, the Court may still order the return of a child.

*Id.* art. 18; *see also Lozano*, 572 U.S. at 20 (Alito, J., concurring); *Baran*, 526 F.3d

at 1345. In other words, a district court has considerable discretion in deciding

whether a wrongfully retained child should be returned.

## ANALYSIS

The two Article 4 threshold issues for establishing that a wrongful retention of a child has occurred under the Hague Convention—age and dual contracting status—are satisfied in this case. It is undisputed that M.R.W. and N.W. are younger than sixteen years old, and both Peru and the United States of America are contracting parties to the Convention. *Seaman v. Peterson*, 766 F.3d 1252, 1254 n.1 (11th Cir. 2014).

## A. Petitioner's Prima Facie Case of "Wrongful Retention"

To establish a prima facie case that a child should be returned where a wrongful retention is alleged, a petitioner must first prove that the child is being kept outside of his or her country of habitual residence. *Pielage*, 516 F.3d at 1287–89. The petitioner must then show that she had custody rights over the child under the laws of the child's country of habitual residence that were actually being exercised at the time of the retention and were breached by that retention. *Id.* at 1288. Here, then, Petitioner must prove by a preponderance of the evidence that: (1) M.R.W. and N.W. were habitual residents of Peru immediately before the start of the alleged wrongful retention; (2) the retention breaches Petitioner's custody rights under Peruvian law; and (3) Petitioner was exercising those custody rights at the time of the retention. *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013). The Court will discuss each requirement in turn.

17

### (1) "Retention" Outside of M.R.W. and N.W.'s "Habitual Residence"

The Court must first determine "whether there has been a 'retention' at all under the Hague Convention." *Pielage*, 516 F.3d at 1287. Although the Convention and ICARA do not define "retention," the Eleventh Circuit has held that "the term 'retention' is meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment." *Id.* at 1288. In other words, a retention occurs when a child is not allowed to return to his place of habitual residence.

The question is whether keeping M.R.W. and N.W. in the United States amounts to a "retention" under the Hague Convention. *Id*. This, in turn, requires the Court to decide when M.R.W. and N.W. were initially prevented from returning to Peru, and whether, immediately prior to that time, Peru was the children's place of habitual residence. Hague Convention art. 3(a); *Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 921 (11th Cir. 2015) (per curiam); *In re S.L.C.*, 4 F. Supp. 3d 1338, 1346 (M.D. Fla. 2014) ("[T]he only point in time when habitual residence is relevant under the Hague Convention is immediately before the retention.").

#### (a) Date Respondent First Prevented Children from Leaving the United States

Although the Hague Convention and ICARA do not specify when a putative retention actually occurs, Elisa Perez-Vera's Explanatory Report on the Hague

18

Conference observes:

> The fixing of the decisive date in cases of wrongful retention should
> be understood as that on which the child ought to have been returned
> to its custodians or on which the holder of the right of custody refused
> to agree to an extension of the child's stay in a place other than that of
> its habitual residence.

Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International
Law, in* 3 Acts and Documents of the Fourteenth Session 458−59, ¶ 108 (1982).
Where the parties previously agreed that the child would be returned on or by a
fixed date, and that date passes without the child's return, courts typically find the
agreed-upon date to be the relevant one for determining the child's place of
habitual residence. *See, e.g.*, *Roque-Gomez v. Tellez-Martinez*, No. 2:14-cv-398-
FtM-29DNF, 2014 WL 7014547, at *6 (M.D. Fla. Dec. 11, 2014); *Taveras v.
Morales*, 22 F. Supp. 3d 219, 232 (S.D.N.Y. 2014) (collecting cases); *Chechel v.
Brignol*, No. 510-cv-164-Oc-10GRJ, 2010 WL 2510391, at *7 (M.D. Fla. June 21,
2010). However, if the petitioner has agreed to extend that date, the relevant date is
the end of the extension period. *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303,
1312–13 (S.D. Fla. 2004).

In her petition and at the evidentiary hearing, Petitioner testified that the
wrongful retention of the children began on January 27, 2021. She stated that this
was the date that the parties had planned for Petitioner to return to Peru with the
children, and but for Respondent's actions, she and the children would have left the

United States on that date. Therefore, the date to be considered by this Court for purposes of the wrongful retention analysis is January 27, 2021.

### (b) Children's Habitual Residence on January 27, 2021

Although "[a] child's place of birth is not automatically the child's habitual residence," *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004) (citations omitted), the Court concludes that Peru was M.R.W. and N.W.'s place of habitual residence when they came to the United States in November and December 2020, respectively. The Children were born in Lima, Peru, to two parents who were living and working together there. A child's habitual residence, however, may be subject to change. While the Children's initial place of habitual residence was Peru prior to December 2020, the question remains whether their habitual residence changed to the United States on or before January 27, 2021.

Neither the Hague Convention nor ICARA sets forth a test for determining whether, and when, a previous habitual residence has changed. The Supreme Court explained that a child's habitual residence depends on the totality of the circumstances and often lies where there is "some degree of integration by the child in a social and family environment." *Monasky*, 140 S. Ct. at 726. Highly relevant factors suggesting acclimation include language proficiency, academic activities, social engagements, location of personal belongings, and the passage of an appreciable period time. *Id.* at 727, 727 n.3.

20

Another factor considered is the shared intention of the children's parents. *Id.* at 727. Without the parents sharing a settled intention to move a child, a change in a child's habitual residence is unlikely "unless objective facts point unequivocally to a change" in the child's "relative attachments to the two countries" such that returning the child to the original country "would now be tantamount to changing the child's family and social environment." *Chafin*, 742 F.3d at 939.

The Court heard all the testimony. Respondent and his witnesses were generally credible. Petitioner's version of events—that this was all a pre-planned "scheme" between Respondent and his parents to secure the children in the United States—is in conflict with much evidence. Petitioner and Respondent shared an intent to move to the United States in late 2020. This can be seen in their actions. For example, even if the moving costs are paid for, one does not move a piano, living room furniture, beds, and all other major domestic furniture from South America to the United States (and back again) for a seven-month, temporary job. The extensive nature of this packing suggests a permanent move. Both parties also bought vehicles in the United States and sold their vehicles in Peru. Their apartment lease in Peru had expired. They disenrolled their children from the well-reputed American school in Peru, and Petitioner enrolled both children as permanent students at a Tampa elementary school. Though Petitioner stated that

21

she registered the children as new patients of a Tampa pediatrician "for purposes of school," she did so after the 2021−2022 schoolyear had already ended at the Tampa elementary school.

While Petitioner remained a candidate for the Peruvian congress, Respondent's testimony suggests that this was not a serious endeavor. Moreover, the volume and number of documents Petitioner gathered for a Tampa immigration attorney during June 2021 suggest that Petitioner intended to apply for permanent residency in the United States. Though Petitioner testified that she gathered these documents in preparation for a possible divorce, the parties' WhatsApp messages show they worked together to compile the documents for the immigration attorney, and emails show that Respondent sent these documents to the immigration attorney on Petitioner's behalf. Moreover, while Petitioner testified that she did not intend to permanently move to the United States, around this time she also bought a 65-inch television for her Tampa apartment.

Petitioner contends that she provided "uncontroverted testimony" that the children's Peruvian travel documents showed that the family only intended to be in the United States for a month, yet this was controverted—Petitioner never supplied the Court with a document showing a one-month timeline, and the evidence suggests a mere one-month trip to the United States was never the plan. For example, the parties toured the Kentucky private school just one day before the

22

alleged wrongful retention date, and Respondent and his mother applied for M.R.W. to become a student there after that date passed. Even if Petitioner believed she was touring the Kentucky private school for N.W. to receive speech-therapy lessons there, the decision to do so the day before the alleged wrongful retention date does not suggest Petitioner intended to take the children back to Peru the next day. Respondent's mother also credibly testified that, at Petitioner's request, she and Petitioner visited three Louisville apartment complexes less than one month before the alleged wrongful retention date. The Court did not find Petitioner's testimony that she only viewed the apartments with her mother-in-law because her in-laws kicked her out of their home to be credible.

The taped message that Petitioner left for her mother-in-law on April 29, 2021, suggests that the joint plan was to move to the United States—but Petitioner was starting to doubt the plan. In the message, Petitioner expresses her dissatisfaction with "all this moving to the States" and mentions that her mother accompanied her to the United Starts for "another life in another country." Petitioner's explanation of this tape at the hearing—that she was only referring to Respondent's move to the United States—was not credible. These statements indicate that it was the parties' mutual decision to move to the United States. Unfortunately, marital discord arose. Petitioner's sister, with no visible source of bias to Petitioner, testified plainly that Petitioner told her they were moving to the

United States.

Based on these facts, the children's habitual residence on January 27, 2021, was the United States, as the parties shared the intention to move their family here.

### (2) "Wrongful" Retention in Breach of Custody Rights

Even if the Court were to determine that the children's habitual residence on January 27, 2021, was Peru and that they are now being retained in the United States, the Court would need to decide whether the preponderance of the evidence shows that such retention is "wrongful." As previously discussed, under the Hague Convention, a retention is "wrongful" only where it violates rights of custody under the law of the pre-abduction place of habitual residence, which rights the petitioner was actually exercising at the time of the retention. *Pielage*, 516 F.3d at 1287; *see also* Hague Convention art. 3; 22 U.S.C. § 9003(e)(1)(A). Petitioner's Peruvian rights of custody were not being violated at the time of the alleged wrongful retention. On that date, before that date, and for some time after January 2021, she had the shared intent to move the family to the United States from Peru. All competent evidence points to this. No credible evidence requires or supports a contrary conclusion.

### (a) Petitioner's Rights of Custody Under Peruvian Law

Here, there has been no prior judicial determination, and there is no formal custody agreement. Accordingly, Petitioner must show that she had rights of

custody over M.R.W. and N.W. at the time of the retention by operation of Peruvian law. *Marquez v. Castillo*, 72 F. Supp. 3d 1280, 1286 (M.D. Fla. 2014). Petitioner satisfies this element so long as she possesses "a single right of custody—even a joint right" under Peruvian law. *Furnes v. Reeves*, 362 F.3d 702, 722 (11th Cir. 2004), *abrogated on other grounds by Lozano v. Montoya Alvarez*, 572 U.S. 1, 8−9 (2014). It is undisputed that Petitioner, as the children's mother, has custody rights over the children under Peruvian law.

### (b) Petitioner's Exercise of Custody Rights at the Time of the Children's Alleged Retention

Here, it is clear from the facts that Petitioner did not clearly and unequivocally abandon the children. She was exercising her custody rights within the meaning of the Hague Convention, but the joint plan at that time was to settle them in the United States, and the parties were undertaking concrete steps to do so. As such, there was no breach of Petitioner's custody rights. Without a breach of custody rights, Petitioner cannot establish a wrongful retention.

### B. Affirmative Defenses to a "Wrongful Retention"

Even when a petitioner has established a case of wrongful retention, a court is not bound to order the return of a child where the respondent demonstrates by a preponderance of the evidence that the petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a); 22 U.S.C. § 9003(e)(2)(B); *see also Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1359

(11th Cir. 2020). Beyond rightly showing that Petitioner has not proved "wrongful retention," Respondent raises and has established defenses of both consent and acquiescence.

Consent refers to the petitioner's conduct before the wrongful retention. *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). However, the petitioner's conduct after the wrongful retention may further inform whether she consented to it. *Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017) (citing *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)). Determining whether a petitioner consented to a child's retention requires an inquiry into her subjective intent. *Baxter*, 423 F.3d at 371.

Under the Hague Convention, acquiescence "requires either: evidence of an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period." *Roque-Gomez*, 2014 WL 7014547, at *10 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)). Like with consent, determining acquiescence is a subjective inquiry. *Id.*; *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999). When the facts showing acquiescence are ambiguous, courts look to the intent of the parent who is said to have acquiesced. *Cunningham v. Cunningham*, 237 F. Supp. 3d 1246, 1277 (M.D. Fla. 2017) (citing *Baxter*, 423 F.3d at 371).

The credible proof, described above, shows that Petitioner failed her burden, and Respondent carried his on these two defenses. Petitioner's conduct prior to January 27, 2021, suggests that she consented to the children's retention in the United States. Petitioner visited Louisville apartment complexes less than one month before the alleged wrongful retention date and toured a Louisville school only one day prior. Petitioner's conduct in the months after this date further shows her consent. Among the other actions previously discussed, Petitioner leased an apartment in Tampa, enrolled the children in a Tampa school for the 2021−2022 schoolyear, worked with immigration attorneys to compile documents needed for a permanent residency application, registered the children as new patients of a Tampa pediatrician, and signed up for in-person English classes to be held during the Fall 2021 semester in Tampa. These same actions occurring after January 27, 2021, also demonstrate Petitioner's consistent attitude of acquiescence to the children's retention in the United States. From January 2021 to July 2021, Petitioner's aforementioned actions show her intent for the children to remain in the United States.

Respondent has sufficiently demonstrated that, even if the children were wrongfully retained on January 27, 2021, Petitioner consented and acquiesced to this retention.

## CONCLUSION

For the foregoing reasons, this Court denies Petitioner's petition, Dkt. 7.

The Clerk is directed to enter judgment and close the case.

**DONE AND ORDERED** at Tampa, Florida, on October 6, 2021.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record

28